Good morning, if the court please. Michael Green for the Appelant. With your permission, the issue that I would like to discuss was whether the false statement to the bank was actually material in this case. And what the court may have gleaned from the moving papers is Guam is a territory that's about 90% Catholic. This law was made initially to the most prominent Catholic family in the island, the Martinez family. Don Pedro Martinez is the patriarch of Guam. This law had been basically delinquent for years. The bank refused to foreclose in violation of federal banking laws. And so my client came along with three people that were discussed as his partners. They made a loan, they made an offer to buy Pedro's Plaza. And then what we have was a loan commitment letter. This is something that lawyers see all the time, and banks see all the time. It was a loan commitment letter that basically followed or traced what would be a commercial loan. Conditions of a commercial loan. Something happened between that letter and when the actual loan document was entered into. The loan commitment letter talks about a $3 million loan, but that's not the $3 million loan that was fully secured without any conditions. I will say that this is the first case I have ever tried where the victim says, I'm not the victim. We have never been defrauded, they say, by the borrowers. They didn't defraud us. They had a loan for $2.3 million. The $300,000... I don't know if you can see this, but this is a $300,000 loan, and this is a $2.3 million loan.  The first trial that we tried, they acquitted my client in two hours. Where Mr. Flores cooperated for 11 months tape recording my client. Willie Flores submitted these invoices to this bank where he was... the fraud that he committed on this bank was clear, but he admitted that my client knew nothing about it. None of the other partners knew he was doing that. He just did it. He wanted the $300,000 because he's probably no more or less stupid than my client was. I'm talking about criminality. They didn't... this bank was going to give them the $300,000 because they qualified for it without a single condition on the $300,000. This bank ignored what happened to Pedro's Plaza. They paid the money. They didn't go the three blocks down the road to see whether there were repairs or renovations being made, and they frankly didn't care. They didn't care, and that's what they told the jury. This is a bank who testified, not only did they believe they weren't defrauded, they were told they were defrauded by the FBI four or five years later. Somebody walked in, subpoenaed from the U.S. Attorney's Office in Guam, subpoenaed their bank records, and all of a sudden said, you know what, you were the victim of a fraud. The bank president and the officers knew fully well about what is called a suspicious activity report. They never filed one, and the reason they said they never filed one is because they said they were never defrauded out of the money. Who put the FBI up to looking into this? Well, that's an interesting question. The FBI requires predication. You know, Guam is a very interesting place, and I don't know, maybe my learned colleague is best able to answer that, because the U.S. Attorney in Guam is also the brother of the president, the bank's lawyer. They're brothers. There's a lot of politics in Guam, and somebody notified the FBI to take a look at this loan. I'm going to tell you straight. You ask the question, I'll try to be as candid as I can about this. Gil Shinohara, my client, was the former governor's chief of staff, Governor Gutierrez. He's been indicted four times by the territory. Dismissed three, acquitted once. There are some underpinnings that have been going on in this part of the world, and I think ultimately what was done was to try to get Shinohara to roll over on the governor. That's my gut. I tried two cases in San Francisco. This case was removed. I tried a number of counts in January. We prevailed. I tried ten counts in April. We prevailed on eight of the ten. There was a motive to this train going down the track, and I am convinced it had to do with getting Shinohara to cooperate. I'm convinced of that. I don't have anything in the record other than what I know happened in communications, which remain private between myself and the U.S. Attorney's Office and my colleagues that I tried this case against. It's over here. I keep pointing in the wrong direction. I'm sorry. I wonder why the table was empty. But, your honors, that's really what I believe happened, but I have never, ever been involved in a case where they bring the victim in who says, I'm not a victim. No one hunts us off. And then the case was removed. Oh, well, you're not familiar with the Hutton case then. Let me ask you about Mr. Flores. I will. Tell us what the problem was with Mr. Flores. When you say what the problem was with Mr. Flores, you mean? You might have cross-examined him if you were prevailing. You know, we tried, as I said, two cases. We had one sidebar in the two trials. At the end of the first trial, when the jury came back so quickly and all these months of tapes and a video in a motel room with Gil taking some money in an envelope, what the government then said by letter was that we were able to finally get, we believe Flores committed perjury before the first jury. And now we're going to indict him. They hadn't before. There was a plea agreement that had not been signed. He had never been charged. They then indicted him and kind of squeezed him to not testify again. And the deal actually became so good that he pled guilty to a charge that was barred by the statute of limitations. I wanted to get into the deal that was made and the fact that the government said he committed perjury before the first jury, at least in their opinion, and the fact now as to his motive for coming back and testifying. This guy's a scoundrel. Not because of the crime. It seems you were prevented from getting into the communications between lawyers unless Flores knew of the communications. That's exactly right. But he did know of the communications. But you weren't stopped from demonstrating that the way I read the transcript. I was stopped. How? Because the judge wouldn't let me ask him. Ask who? Flores? Flores. That's why we went to sidebar. He set up certain brackets that I would have to at least get into before I got into the conversation. Right. And they came out. Volunteered by Flores. And I wanted to then complete it and be able to show his exact motive for why he was testifying and going into not just the deal but the fact that he was accused of perjury by the government that put him on. And the judge says you're not going to do it. And that was the end of it. Look, I will tell you, I was given a great trial. Judge Alsup gave me a great trial. I'd look a lot younger if all the cases I ever tried were in front of that judge. But in that one area, which I thought was really important, so the trier of fact could actually listen to Flores and understand who he is and what he was, it wasn't just enough to be able to show that these communications, these invoices, and things that he submitted to the bank, he falsified signatures. He kept a man's signature for years in his files and just forged his signature. Did you explore all of that with Flores? Oh, that part I certainly explored. And the perjury? No. I was not allowed to do that. You asked him, did you commit perjury under such and such a circumstance? You were not allowed to do that. You know, I asked him about committing perjury I don't know how many times, but I wasn't able to go into, that's my memory, I wasn't able to go into the fact that the final deal that got him to testify, because he refused to go forward in the second trial, was the government threatening him with perjury. Well, somebody committed perjury. I mean, they said they believed he perjured himself, whether they could actually prove that if they wanted to charge him, but it certainly was on the table, and his lawyer withdrew. His lawyer walked away. After he was going to plead guilty to a time-barred count, his lawyer left, we bring a new lawyer in, who actually had done work for the government, had done some contract work for the U.S. Attorney's Office in Guam, and within 30 seconds this guy is back on track. All I'm saying is, generally speaking, I believe lawyers are kind of blown into the wind when they come in front of your honors or other appeals courts and argue that, you know what, the jury did me wrong, the evidence was insufficient. But in this case, when we're talking about materiality of this letter, and we have what the bank did in changing the loan, and the bank admitting this was really a personal loan. The lending officer said this went from a commercial loan to a personal loan. That's the way we drafted it. No conditions. And they all said we weren't the problem. The jury was fully instructed on materiality, and even told they could consider the bank's laxity in connection with materiality. Yes. And their conviction gave me my opportunity to write this brief. Did the trial judge stand a motion for new trial at that point? Just denied. Just denied. I mean, it was, this is very hard for it, but I believe that when we just look at, it's not even when we talk about reasonable inferences, this is testimony that was enunciated, pronounced from the witness stand, and from the very alleged victims. We weren't the product. This was a personal loan. There were no prohibitions on how the $300,000 could be spent. And I did cross-examine the bank officer, and what we got into was the fact that the day before, when I questioned the president of the bank, and he said, well, the conditions and terms had changed, there were no restrictions on the use of the $300,000, he kind of said, well, I guess there were not. Well, there weren't. These guys were idiots to write the letter, as I said, but the issue of whether that was a crime to get the $300,000 they were entitled to under any conditions is really what the issue is, and everything kind of flows from that, other than what Justice asked me regarding being precluded from actually going into the heart of the fact that Willie Flores, in the government's perception, had lied under oath, and I think I had a right to ask him those things. But everything else seems to flow from that, and the enhancement of the penalties, the advisory guidelines, and those kinds of things. And as I said, no disrespect to the people of Guam, but unless you spend a lot of time down there and you understand the politics, I understand why this indictment was brought. The second one, in fact, it's not on the record, but Judge Alsop wanted to know whether the government was going to proceed to the second trial after the first one was decided so quickly on what the government obviously perceived was the best case they had, of the severed counts. I'll be happy to answer any questions if you have any. Do you want to reserve five minutes? I will. And then we can hear what the government has to say. With your permission, Justice, I will. Thank you. Good. Good morning. May it please the Court. I'm Jeff Strand. I'm an assistant U.S. attorney from Guam. A couple of housekeeping matters. First, if I can, the United States attorney that Mr. Green refers to was not the United States attorney at the time that this investigation was initiated. And as a matter of fact, during the time that the matter was being investigated and prosecuted, he was recused from the matter because of his relationships with not only the president of the bank, or the lawyer for the bank, but also had some relatives involved in the portion of the case that resulted in an acquittal. The matter was supervised out of Washington by the public integrity section. As a second matter, let me represent to the Court that the government had never accused Mr. Flores of perjury. This dispute arises because of a letter that was written by Mr. Flores' then attorney, Frederick Curley, which stated that we had told him, the attorney, that Willie Flores had not truthfully and candidly accepted responsibility. Now, on the record is a denial from my co-counsel at the case, Joe Wilson, that he never told Mr. Curley anything about Willie being untruthful. But the government's concerns were exactly the last part of the sentence that puts this matter at issue, and that is, we were not satisfied, given Willie Flores' performance at the first trial, that he had accepted responsibility. Let me give you a couple of examples. There was extensive cross-examination of Mr. Flores regarding bad checks that he had written, showing him to be a deadbeat and in desperate need of money, and that being a motivation for all of his testimony. Mr. Flores took the attitude that he had done it, he truthfully admitted the checks, but his attitude was one of, I was forced to do it by fate, business circumstances, the fact that I was out of money. That, to the government, indicated that he wasn't taking responsibility for his bad acts, that there was no remorse, contrition, repentance. What is his incentive to plead guilty to a crime that is time-barred? He waived the statute of limitations. What's his incentive to do that? I think he thought that the statute of limitations waivery and the initial plea agreement would stand up to challenge, and that we would be able to prosecute. But if it was time-barred, if the crime to which he pleaded guilty was time-barred, you couldn't prosecute him. I believe that the statute of limitations is a waivable right, and he waived it in his initial plea agreement. No, and so I'm asking you, you're not answering my question. I know he waived it. The question is, what was his incentive to do so? I think that he thought that he would get the same deal that he got the first time if he pled guilty the second time. So he was looking at worse charges, that he fought his way out of it by pleading guilty to something else? He was looking at the same range of charges, but he was looking to get the same narrow plea agreement to the one count, which, in fact, he did after he was indicted. He initially resisted and then obtained new counsel, as Mr. Green has indicated, and the new counsel brought him in, and the agreement was made that he would plead to the same charges that he would have pled to under the initial plea agreement. And what was the incentive for the government to have him plead exactly the same? To enforce in his mind that there was something for him to be responsible for. We thought that he was adrift. The initial plea agreement was unusual in that it was contingent. Excuse me, what? Contingent. Contingent. Or conditional. The government had reserved the right under the plea agreement to decide whether to charge him at all at its own discretion. And as a consequence, when we came around, and I'm sorry, I've forgotten the question. Well, I was trying to figure out why the government, the second time around, got him to plead to the same charges the first time around instead of getting him to plead to charges that were not time barred. Well, there were no charges in that indictment that weren't time barred. I see. So you would have had to bring a separate indictment, and you'd prefer just to stick with the indictment for which all the charges were time barred? We knew that he had admitted already to the facts underlying that particular charge, and we wanted to have a tether to tie him to so that he didn't drift off and deny responsibility for the activities that were much more wide-ranging than were described in the indictment. My other argument on that point is that the cross-examination was as thorough as could possibly be. All possible means of exploring Mr. Flores' motivations for testifying were explored. The statute of limitations of the indictment, all of the circumstances surrounding his plea of guilty were allowed. The only exceptions were that Mr. Green was not allowed to cross-examine Willie Flores as to his threat to take the Fifth Amendment. The judge found that that was irrelevant given that he was testifying. He also prohibited inquiry into the breach of the plea agreement or, excuse me, into Mr. Flores' initial reluctance to plead guilty. However, Mr. Flores did testify on cross-examination that he did initially resist pleading and had to be indicted. The matter of the alleged statements by the government attorneys about his truthfulness was not prohibited. Mr. Green was prevented from exploring that with Mr. Flores before the jury, but he was not prevented from asking to do that on voir dire or in a hearing outside the prisons. So there was a foundation for what the trial judge wanted. Yes, and that was never requested. What did Mr. Flores get in terms of consideration for his cooperation with the government? He got a recommendation from us, Your Honor, for probation. He was eventually sentenced to eight months by Judge Elson. The other side, your colleague tells us this is an unusual case. The so-called victim testified that the victim wasn't the victim, that they weren't the fraud. Your reaction to that? I think I covered that in my brief, Your Honor, that the bank was slip-shot. There's absolutely no question that the bank was very negligent in administering this loan. They were in desperate circumstances. They needed to unload this piece of property, which was owned by a prominent family that included a number of Catholic sisters, and there was the prospect of angering the church. But they did testify, bank officers did testify to all of those things that they tried to do to make sure that the partners, including Mr. Shinohara, knew that the money, the $300,000, was going to go to renovations. And as I note in my brief, to think otherwise is to think that the bank wanted that property back in an unrepaired condition. If they were just sort of giving the money away, they were just going to get their collateral back minus the money, and it doesn't make sense. Thank you. If there are other questions, otherwise I think the other issues I would rest on my brief. What is the evidence that connects Mr. Shinohara to the conspiracy, to the agreement to defraud? The testimony of Mr. Flores, the testimony of the partner that Mr. Shinohara selected to be in on the partnership, Mr. Goto, both testified that they all knew that the money wasn't going to be used for renovations before they made representations to the bank that they were going to do the renovations. And you cited one bit of documentation when questioning Mr. Green, but there is another one that's perhaps more important. That bit of documentation doesn't really connect to Mr. Shinohara. On May 27, 1998, all four partners and their spouses signed a letter required by the bank stating that the money that was about to be disbursed, the $300,000, was to go to renovations. I don't have an exhibit number at my fingertips, but that letter itself is a representation correctly from Mr. Shinohara that the money that they then knew wasn't going to be used for representations was going to be. At least that's what they were representing to the bank. If nothing else, I'll conclude. Thank you. Thank you. Mr. Shinohara, listening to the government, it's almost like a reverse argument. It's something that you would expect a defense lawyer to argue, as opposed to an assistant United States attorney. What he says to you was, this loan was really handled negligently. He used the word slipshod, but he kind of says it was negligently handled. Well, that belies the truth. Before this loan agreement was signed, there was never an appraisal done as required by federal banking laws. They didn't foreclose on the Martinez family in violation of federal banking laws. If they thought they were defrauded, they didn't file a suspicious activity report in violation of federal banking laws. When we came to the bar of justice to try this case, they were already threatened with losing their bank. They were either going to step up to the plate and take responsibility, and all of a sudden say, you know what? This really was a commercial loan. It never was. They had to get rid of this building. They had to get it away from Martinez family. They could never foreclose on Don Pedro's family. Couldn't happen. Their entire bank is predominantly Catholic. They foreclosed on this family. They can close the front door. The $300,000 was a done deal. It didn't matter what it was going to be used for, and they didn't care. They knew there were no renovations being done because it wasn't a precondition of this loan. It didn't matter to these people. It was in a May 27th letter signed by Epifany. I mean, I don't know how stupid that is. As I said before, I've used that word before. It didn't matter what they said. They could have spent it at the dog track in Guam. They said they wanted... What I think really happened was, I think that when we look at the commitment letter, it talks in terms of monies being used for repairs and renovations. By the time they actually signed the document that controls, there are no conditions. They're writing letters saying, you know, we want it for repairs and renovations. It didn't matter. This bank and the bank officer testified when they actually made a commercial loan to one of the partners, Willie Flores and his father. They went down there several times a week to make sure repairs and renovations were done because that's how you run a commercial loan, to make sure that's how the money is used. They got the Don Pedro family off this thing. They brought these four people in that were the only people interested. They saved face for the family. They saved face for the bank. And admittedly, all these years, never believed they were deported because they were not. I hate to say this because, you know, I've been involved in this system for so many years and I'd like to think that when people raise their right hand, the truth is coming out in the courtroom. But they changed dramatically between what this loan was when they were threatened by losing this bank and federal officers coming in and taking over the bank because of this loan and the fact that they keep saying, we weren't defrauded. We just needed to get out from under this thing. And now all of a sudden, well, you know what, the $300,000 should have been used for renovations. Nowhere in this trial record will you see, and frankly, I wasn't going to risk the question, but the government certainly didn't ask anyone from that bank if this money was not going to be used for repairs and renovations, would you still have given it to them? You know, I looked again at the florist thing, and I don't think the judge stopped you from doing anything except putting the letters into evidence without laying an appropriate foundation. The judge said the letters really misstate the government's position. Then he goes on for pages saying, you know, you can do anything you want. You just can't use these letters in front of the jury that way and lessen until you lay all the foundations. I'm not saying you can't make the arguments like that if you can prove it in good faith, but what I'm saying is at least two or three of these letters try to put words in the mouth of the government what the government's position is. It's completely inadmissible as far as I can tell. As soon as you do anything you want, I'm proving the guy's motivation. You're just not going to be able to spring these letters. I did not lose this case because of that ruling of the judge. Not a chance. But he lets you do anything you want except use letters that he found misstated the government's position because it was one lawyer claiming what the government said that the government denied. I agree. If I had to rely on that colloquy of sidebar to win this case, Mr. Shinnehara would be spending a lot more time in prison. I agree. Yes, I didn't lose the case in that argument. I threw it in there because I needed to do that because that's what lawyers do. Well, we look at things seriously even though you just threw it in there. No, I appreciate that, Your Honor. But as I said, that's not... There was... When I looked at this, when this jury deliberated, I was satisfied that it wasn't that colloquy and that denial of the right to confront... You clobbered Flores. Well, I did the best I could, Your Honor. He was perfect for it, Your Honor. At any rate, as I said, I... But you also prevailed. I mean, he was only convicted two counts. He prevailed. No, you know, I don't think it's a balancing test for lawyers. I think that... I didn't get personally involved in the case even though I happen to like my client. But when I look at what this bank did and I look historically at how their banking procedures were and I saw who the original loan was and I saw how they would do anything to loan this money, $300,000 was a fee complete. That was their money. And that's why, Your Honor, if you look at the other $700,000, the commitment letter's $3 million. The loan agreement is $2.3 million. They hadn't given them the other $700,000 without more collateral. They changed it. But they had to give them the $2.3 million and they didn't care what the $300,000 was used for. And that's why they at least admitted initially, we were never defrauded. It was their money to do it how they wanted. I have a question just on the sentencing. The government concedes that they've sent level for money laundering two to six, not eight. Is that harmless there, given the sentence that he received? Well, perhaps. I mean, the enhancement is what I was concerned with because the $300,000 jacked me up to 32 months and I still don't think the $300,000 clearly was... That letter was not material and the $300,000 was not the result of any bank fraud. And I looked to the bank officers who testified that basically it wasn't. Thank you for your courtesy. All right. Thank you very much. United States v. Shinohara is submitted. United States v. Leong has been submitted on the brief. Submission has been deferred in light of Cavalli-Cardi on United States v. Ramos. And we will take up Uriah v. Gonzalez.
judges: Trott, Wardlaw W. Fletcher